We have a couple of changes that we want to make with respect to arguments this morning. We have four cases set for argument. One case is on the briefs. As you know, this morning we reordered the argument so that both Polaris cases will be heard first, one after the other. The panel would like to have counsel limit their argument this morning to the constitutionality of the appointment of PTAC judges to that issue and not on the merits. And given that the parties are the same and counsel is pretty much the same, we'd like to hear that argument once. So both Polaris cases on that issue will be heard now. I'm going to give you the same amount of time, 15 minutes per side, but of course it's an important issue. So if you require more time, I'll judge that as we go along and act accordingly. You will have to divide your time and let me know how much you want for rebuttal. And if you want to take a couple of seconds to confer on that issue. I'd like to reserve five minutes, Your Honor. Five minutes? Yes. Okay. Are we all set? All right. Let's get going then. May it please the Court. I'd like to begin, if I may, obviously I'm happy to answer any questions the Court has, on discussing what I think the impact of the Arthrex decision is and why this Court should not follow the suggestion of Kingston and the government to hold this decision in advance, awaiting the issuance of the mandate in Arthrex. Well, how can we? I mean, the mandate, the Arthrex decision doesn't even apply until it mandates, does it? I've been looking at that. I mean, isn't that black letter law that it's... I mean, certainly we are bound to follow it, but... That's my point. But it can't be sent...  Wouldn't it be really odd for us to send stuff back to the Board before the lead case mandates? Let me just ask you a practical question, because my guess is this is what's going to happen if we send it back, and this is why the government's urging us not to do it. They are probably now considering, I'm sure they're considering, whether to file a petition for reviewing en banc. And that takes a lot of time in the Justice Department, it has to go to the Solicitor General's office. And so they're going to do that. But if we send this back, then they're going to end up filing a petition here, too, and doing the same exact thing. So why make everybody waste time filing multiple petitions? I understand the Court's question. And just as this case would not go back until its mandate issues, that's the same with Arthrex and here. So you're not going to be sending this one back because the mandate... Exactly, but that's why I just asked you, why are we going to waste anybody's time? Because the government, if it chooses to file a petition for re-hearing en banc, it's not going to let you go in this case and only do it in Arthrex. And so not only are they going to file petitions for re-hearing, it's easy for them, they have to file one and copy it a half dozen times. You all have to spend your clients' money responding to it in different cases. There's one very, very good reason, and that is because the Arthrex case is not a vehicle to raise the second of the two main issues it raises. The Arthrex case decision raises two large issues. One is, of course, the constitutionality of the current arrangement. The second is the efficacy of the cure that the Arthrex decision chose. The Arthrex case is not a vehicle for that appeal because all, as the Arthrex decision noted, all parties in that case agreed that the court's solution would work. That it would cure the constitutional deficiency. In this case, that's not true. We do not agree that the Arthrex cure solves the problem for two reasons. Well, I don't understand how that has any difference about whether we send it back now or not because we're bound by Arthrex. You are bound by Arthrex, but we would file a petition for re-hearing on Bonk. Okay. And that petition for re-hearing would raise two issues, and the Arthrex petition could only raise one because all of the parties have previously taken a position as the efficacy. Let me ask you this. Arthrex, I think it's clear, did not raise the constitutional challenge to the board. And there are some, I think in the Fifth Circuit on Bonk case, they relied heavily on some of the cases finding that that didn't happen to provide no relief whatsoever. Did you raise this constitutional challenge to the board, or did you raise it for the first time here? In 1831, it was raised before the board. Okay. And in 1768, it was not. Okay. So that means at least as to 1831, and I would argue we agree with the Arthrex decision about why you would not find a waiver for all the reasons that they laid out. Well, I get that, but isn't – there's a – it seems to me when the Fifth Circuit was looking at it, they were looking at it in two different ways. Clearly, an appellate court can always reach an issue even if they normally apply a waiver if they have a good reason for it. But I think they weren't just looking at the waiver doctrine. They were looking at whether you were entitled to a remedy or not if you raised it too late. And as to the too late point, I think the Arthrex decision answers that as well, which is this court is the first opportunity for relief. And that decision, I believe, is a correct one as a matter of law. Well, isn't that true in Lucia as well? I mean, Lucia couldn't – you couldn't say to the officer, you're unconstitutionally appointed, don't rule on this. Isn't that a fundamental baseline of administrative law that – I'm not aware of a finding by – the answer is different depending on what the remedy is and what the board is. And here – Well, sure, the answer is always different. But the general law, as I understand it, is if it's a constitutional challenge to the structure or the appointment or the like, the administrative body just can't declare itself unconstitutional. I agree with that. They can rule on – as applied constitutional challenge, I think there's all kinds of cases like that. And that's the problem we have here, certainly. I don't think the PTAC could declare itself unconstitutional. It's the problem – but it's the same problem in Lucia and some of those other cases that the circuit is talking about. My point here is that it would be most helpful for the court through the en banc process. To let you file an en banc petition too. Because we can raise what may ultimately be the more important of the two issues, which is whether the constitutional cure works. And it's our view that it does not. When do we get to that issue? Thank you, Your Honor. The second issue is whether the cure works. And in my view, it does not work for two reasons. One is I think there's a serious question as to whether the court has the judicial power to rewrite the statute to the extent that it did. I recognize the fuzziness of the test that that implies. It often depends on what you speculate that Congress would have liked. But isn't this – I mean, this seems to me to be not a great argument for you. Because when various courts have faced various appointment clause problems with inferior officers because their removal provisions were too restrictive, this is exactly what a bunch of other courts have done. This is not us staking out new territory, is it? So I think it is. The intercollegiate case is the only one I'm aware of. I can't say that it's the only one. But it's the only one I'm aware of where there was no form of review within the executive branch. If you look at First Enterprise Fund, that had some form of review as well. So there was a combination of the two. And my view is – and this goes to the second reason that I think the cure from the Arthrex decision is not sufficient – is that while this court followed the guidance of the D.C. Circuit intercollegiate, I think it's inconsistent with the guidance from the Supreme Court in Edmonds, Free Enterprise Fund, all of which say that the key issue on the distinction between a principal officer and an inferior officer is is that officer rendering a final decision above the executive branch. That's the language from Edmonds. That's the holding from Free Enterprise Fund. Wait. I think I'm misunderstanding what you're getting at. I thought you were going to argue that the fix was improper because it wasn't consistent with the intent of Congress. You're arguing that the fix doesn't go far enough. I'm arguing both. I did the first one first and the second one second. So the first one I believe there's a serious issue that hasn't been briefed really about the extent of the court's power to rewrite that statute. And as I said earlier, I recognize that. Sure, but that's the easier question. I think it's about there's all the precedent that says look and see whether Congress would rather have the scheme without the employment restriction or not. And I would move on to your second point because I think that's a harder one. I agree. I wouldn't use the word rewrite. I'd use the word save. Yes, I understand the difference. But just this issue hasn't been fully briefed by anyone as far as I'm aware. There is a reasonable basis to believe that when Congress laid out specifically that some PTAB employees and PTO employees are terminable at will and then did not do so for the PTAB judges, that that supports an inference that that was a delivered intentional choice and therefore reflective of their intent. And as I say, that issue hasn't been briefed anywhere fully yet, so I'm not capable of giving you chapter and verse on that. But I think there's a serious question. I don't know that that really helps you so much, because it may mean that they originally intended them to be only removable for a cause, but then it faced with the question, which is always the severance question, do you want the whole scheme to go out or do you want to change your mind on that? Then we look for evidence of that. I agree with you. That's exactly the process. And what we're doing is we're sort of backing into the merits of Arthrex at that point. We are, but that's the first part. I'll move to the second issue, because I agree that's the more fundamental question. In my view, although the court followed the guidance of intercollegiate from the D.C. Circuit, the guidance from the Supreme Court is to the contrary and says that it's not enough merely to have terminability at will, that you must have some form of executive branch review. Otherwise, those APJs are rendering final decisions for the executive branch. And that's what Edmunds says is the text. And here the APJs are doing exactly that. They are called final written decisions. Well, supposing one accepts the government, the argument the government made in Arthrex that I shouldn't use this word, but it's a shorthand, that the director has the ability to rig the result. They made that argument not in those words. Yes. And Arthrex, I think, properly rejected it, because the director could rig the result only if the director chooses the people to do it and chose knowing what they would want to do. And I think the court would have serious due process concerns about running the PTO that way. Well, that's a different constitutional problem than an appointment clause problem, though. I mean, the director certainly has the authority to assign judges to panels, right? No, there's no question about that. There's no evidence he has the power to deassign, but he has the power to unassign, to not assign. That's not clear. The Arthrex court specifically said that's not clear on a footnote. Yeah, but there are other procedures that if he doesn't like the decision from the panel, he can create a larger panel, right, and stack them. I know all these words. The Supreme Court hates all of this stuff, and I do think there might be presidential or due process problems with it. Exactly. But that doesn't mean it doesn't give the director amount of control over the actual APJs. I don't think you save one constitutional violation by creating another. I don't think that's what Congress would have intended, and I don't think that's what the court should be doing. And in any event, that wouldn't cure the second more fundamental problem, which is that the Supreme Court cases, in my view, when you look at Edmunds, when you look at Freytag, and when you look at Free Enterprise Fund, all require some form of review. That is the point. Are these people rendering final decisions for the executive branch? That's the test in Edmunds. And if the answer to that is yes, in each of those cases, they were not an inferior officer. And then the question becomes, is terminability at will an effective or appropriate mechanism to achieve that result of real review? And I would argue it's neither. How does it play out in the Lucia scheme now? The problem there was they were appointed by the wrong person. Yes. Were they – was there further review there? They remanded back for further review by – No, no, no. I don't mean that. I mean in that scheme was the hearing officer, whatever their title was in Lucia, that was improperly appointed. Was that decision reviewable further within the executive branch? Presumably. I mean maybe it was, maybe it wasn't. If you don't know the answer, I don't want to waste up your time. I don't know the answer. I don't know the answer either. That's why I asked the question. Maybe somebody on the other side will help me. You've made, I believe, two points, and I think you said you had a third. The last point I wanted to make is the question of whether if there is no supervisory review, effective review, which I think admins and free enterprise all require, is terminability at will an effective or appropriate means to accomplish that end? And I think not for two reasons. One, if you're terminating after the final written decision is issued, it's issued. If you're relying on the interim effect of APJs being worried about being fired by issuing a decision based on a ground that they think the director might not like, that seems like a fairly blunt instrument and not a very appropriate way of doing it. And I think the idea that Congress would have wanted that system where APJs are constantly worried about their livelihoods and issuing decisions based on speculation about what might or might not appease the powers that be as opposed to a straightforward system that had a level of review, I think the odds are Congress would not prefer that strange system. I found your opening statement intriguing because you said you were going to discuss the remedy, and I'm not sure you've gotten to it yet. What's the remedy? I believe the remedy is that required by free enterprise fund and admins and others, which is some form of effective, meaningful, substantive review of decisions within the executive branch before it becomes final and revealable by a court. So basically non-separability. Sorry? I mean, basically the whole system goes down, right? I mean, we can't order. Oh, you can't order that, for sure. That has to be done by Congress. Right, so in your view, it's not separable. In my view, it is not separable. So we have to strike the whole statute. I believe the only remedy, and that's why we asked for dismissal as opposed to remand, the only remedy is to declare it unconstitutional and let Congress fix it. And if I'm right about the importance of review, which the Supreme Court has repeatedly emphasized, that's something that this court can't fix, as the Arthrex Court acknowledged. And while I understand for expediency and other reasons that's a suboptimal state of affairs, it may be the appropriate state of affairs. And that means that Congress then has to go back and establish, and Congress then has to decide whether they want a system with an intermediate level of review. Maybe they do, maybe they don't. But that would be up to Congress, not the courts. Okay, Mr. Powers, I'll restore your five minutes. Thank you. Thank you. It's Mr. Blanco, right? That's right, Your Honor. And you're going to split your time with this Attorney Patterson? Yes. Okay, so she'll get five minutes, you get ten? That's right. Okay. Good morning, Your Honors. May it please the Court. Michael Blanco with Fish and Richardson on behalf of Kingston. I'd like to start with... Can I actually just direct you to your friend's last point, which is that when we're looking at remedy for these improper appointments, that at least some form of executive review of an inferior office position has always been the touchdown. The case law in this area, I think, is very fact-dependent and not altogether clear. Are you aware of any cases where it wasn't a problem, even if there was no effective executive review? I think there are some cases suggesting that, Your Honor. And I think just to step back for a moment, the cases all suggest that, you know, Edmund says there's no exclusive criterion. I think it's a mosaic approach. We take a balancing act and we look at the different levers and see if there's more in one, less in another, and if they balance to, you know, overall support constitutionality. I would look at Edmund itself. There, it's true that the military judges there, their opinions were subject to review by the Court of Appeals for the Armed Forces, but I note the review there was highly deferential. The review was not a true de novo, you know, look at this altogether and be able to change anything that we'd like. The review was, I think on the facts, if there was any, you know, factual basis for the military judge's opinion, the higher court had to defer those facts. So I think that suggests in and of itself that full review is not necessary. I think that's also the case in this court's Macias, I think I'm saying that correctly, decision, where the Vaccine Act Special Masters, their decisions also received a deferential review. And just to make another point on review, I quibble a little bit with the suggestion that there isn't review at the agency of the APJ's decisions. I think there is for several reasons. The director has the authority to designate decisions as precedential, and through that he can direct the outcome in a given case. The director also can issue binding policy guidance that could in certain cases be directed at the facts in that case. You can imagine a circumstance where a final written decision issues after it issues. On that last point, what's the statutory authority that allows the director to issue binding guidance that binds the APJ's as opposed to the examiner court? I think we see it in several places, Your Honor. I think Section 3 gives the director broad control over the agency, and I want to make sure I quote the statute properly. I guess here's what I'm thinking of, and this is not related to this case necessarily, but when you say that the director has been issuing lots and lots of 101, as you know, guidelines on eligibility. That's right. And it is not clear to me whether the APJ's think they need to follow that guidance or not. It seems in your view they need to follow that. They do, and a couple points. What happens when that guidance is openly inconsistent with precedent from our court? Who do the APJ's have to follow? I believe the APJ's are bound by the director's interpretation of 101. If that comes up to this court on appeal, of course, and it's wrong, then this court will reverse the decision. I believe the APJ's, though, are bound by the director's policy guidance. I don't want to waste your time on this point. This is a very subsidiary point, but you can move on. If I could, Your Honor, unless there were more questions about the reviewability point, I do want to. If the board issues a decision and it comes up to us in review, are we to assume that the director has reviewed that particular decision and has decided whether or not to intervene? Every decision, not necessarily, but that doesn't take away from the director's power to review any decision. And in any case, the director may review the decision. I don't think that the Constitution requires that in every single instance he has. Again, in cases like Edmund, deferential review where fact findings are not reviewed with much scrutiny on appeal held sufficient. So, no, I don't believe that that would necessarily have to be the case, Your Honor. If I could just touch on what we mentioned in our 28J letter, which is that our belief is that the proper, the most prudent course here is to hold any decision in this case in abeyance. And I want to be careful with how I say this because I want to express my sincere respect for this court as an institution and its opinions. But the Arthrex opinion has not mandated, it's not final. And we disagree with the result reached in that opinion and believe that it's a candidate for a petition for rehearing. And I'm not saying that because. Can I ask you this? Sure. I think your friend agrees with you to a certain extent that the Arthrex opinion is wrong, too. I think you're right. He's on different points and thinks that he wants to be able to get a decision out now so he can raise his further points on rehearing. You have your arguments. Rather than issue a decision and have this all on bonk, and this is just my idea, I haven't cleared it with my colleagues and they may disagree. If you have further supplemental briefing that you want to do on the effect of Arthrex on this case, why don't we just do it before we issue an actual decision rather than waiting for a decision on bonk? I can't promise you this. They have to agree. They may or may not. I'm probably annoying them by suggesting this in open court. I apologize. Well, allow your honors to confer on that point. If it's helpful to the court, we'd be happy to do that. It seems the most efficient way to go about it because your friend clearly has additional arguments that were not, I think, considered fully in Arthrex. And you have arguments about why it's wrong and may have different arguments about why it's wrong. I suspect we're going to hear from the government about why it's wrong, too. And while Arthrex is stare decisis, that doesn't mean that we can't articulate our opinions about it. Certainly, your honors. And if additional briefing were helpful and then the court were to issue an opinion based on that supplemental briefing, I can say that I believe we would ourselves, I can't speak for anyone else, seek rehearing if the case were decided on the basis of Arthrex. Well, a counselor can, pursuant to our rules, make additional filings. It would be up to the court to decide whether it's going to accept them or not. Fair point, your honor. Okay. Are you almost done? Unless there are additional questions from your honors, I think I cede the podium to the government. Okay. Thank you. Counselor Patterson, some of your time was used up by a colleague, but I'm going to restore you back here for five minutes. Thank you. Thank you very much, your honor. So I'm going to talk to you about the remedy. I read your supplemental brief in Arthrex. It's a little confusing to me that you acknowledge that we can hear the appointments clause issue, even though it wasn't argued below, but then you argue they still shouldn't get a remedy because they didn't raise it alone. I don't quite understand that. Why is that correct? I mean, if we're going to allow them to raise it for the first time on appeal, then isn't it an acknowledgment not only that it's a problem that's important, but it's a problem that needs to be remedied? We don't think forfeiture is an all or excusing forfeiture has to be an all or nothing proposition, and we think that follows from the Supreme Court's decisions in Lucia and Ryder, as well as the sort of traditional equitable principles that accompany crafting a remedy. So even if at the front end the court, for various prudential reasons, decides to reach a waive issue, we don't think that obliges it to go whole hog on the remedy. And I note that the Supreme Court's emphasis on a timely challenge being raised in Lucia and Ryder, that didn't come in any sort of front end waiver discussion. It came in the remedial section. And so we think that as a matter of sort of equitable discretion, even if a court wants to clarify a question, we agree this is an important issue. It wants to get some precedent on the books and tell the agency how to conform with the Constitution. That doesn't mean that it needs to remand every forfeited challenge. And that's actually where I'd like to start this morning about the effect of Arthrex. I'd like to ask you a question about the effect of Arthrex, and that is what other agencies or government entities are implicated? I know you've been thinking about it. And we will continue thinking about it for the next 42 days, Your Honor. We have 45 days to decide whether to file a rehearing petition. Of course, part of the reason that there's that extra time in a government case is because we do consult with other agencies. The Solicitor General's Office makes the ultimate decision after looking around the government and thinking about all those consequences. So I can't give you a list today. I don't know if we'll ever file a rehearing petition that includes such a list or not. But I think suffice it to say this was a very important decision. Striking down an act of Congress is always a very serious matter, even with a partial invalidation, that we will be looking at very seriously while the Solicitor General decides whether or not to seek rehearing en banc. But turning back to Arthrex, I just want to note the reasons that the Arthrex panel articulated for using its discretion to reach a waived issue, I think don't necessarily apply to follow-on cases. So Arthrex actually was not the first case to present a forfeited appointments clause challenge to the PTAB judges. The first case argued was a case called Trading Technologies, 18-1489. I believe Judge Wallach was on the panel. The panel did not reach the issue there. They issued a Rule 36 Affirmance. I think that shows that different panels can and do use their discretion differently. Now the Arthrex panel, of course, explained that because of the significance of this question, because of the importance of answering this question, giving timely resolution to the many parties who were looking to the court, it decided to exercise its discretion to overlook the waiver. Now in these cases, we have one preserved challenge, where of course the court need not engage with the waiver question at all or the discretion regarding remedy that we discussed in our Arthrex supplemental brief. But in the other case, in the 18-1768 case, we would urge this court to not exercise its discretion in that matter. So the harder question for me is in the case where they preserve not only in their blue brief here but at the agency, why wouldn't LaChia require a remand there for a hearing before a new set of judges? That was also addressed in our supplemental brief. Of course, that is the remedy that's in place now. We acknowledge that's the remedy that's in place now. No, I understand. Again, we all recognize that that's binding on us, but it also hasn't mandated. And that there's, I mean, I'm sure you all had a very, very busy weekend. Sorry it happened so short on oral argument, but that's the way it goes. But clearly lots of people have lots of questions about how it's going to play out. And so I'm just curious, because Arthrex didn't have the case where it was preserved at the agency, which is one of the touchstones for your analysis, at least for equitable relief, as you call it, why wouldn't, assuming Arthrex holds up on the merits, at least in the case that they preserved at the agency, they get a remand to new judges? I think under Arthrex they would, Your Honor. No, but not under Archex. Under, do you think Lucia requires? I guess I'm asking you, even if they preserved it at the agency, does the government think remands for new hearings before new judges are necessary in any cases, not just certain cases? No, Your Honor. And what's your argument for that, particularly distinguishing Lucia? So Lucia was the first case to order such a remedy. The court didn't say a lot about why it did it there, but subsequently an en banc panel of the Fifth Circuit in the Collins case has articulated a potential difference when there's, for cases where at the relevant time there was what's later deemed an invalid removal restriction, as opposed to when there's an officer who was actually never appointed at all. Lucia was the latter situation. The ALJ at the relevant time was not operating under a head of department appointment at all. Sure, that to me, if we're thinking of remedy as these, a bunch of different factors, some laying against and some on, that distinction makes a lot of sense for me. But the problem with that Fifth Circuit case is the facts are all so much different here, are they not, in that the actions taken by the unconstitutionally appointed officer were subject in some sense to further review. I don't know that that's necessarily the touchstone. I think at a slightly higher level of generality, the Fifth Circuit's intuition that those situations are different and might require a different exercise of remedial discretion is sound and would apply here. Now, I do, on the question of what I will call hasty remands. Before you get to that, is it your position that had the question been raised before the agency that they could have ruled on their own unconstitutionality? I do think they could have addressed the issue, Your Honor, and addressed it fruitfully. Recall that in this case, as an Arthrex, there was a dispute among the parties as to very basic questions about how the agency runs, what the director can do, even what removal regime exists. I think the Arthrex panel had to adjudicate a fight about specifically whether the ALJ removal standard applied or whether this was an APJ specific or the efficiency of the service standard. Those are all issues that the agency could have, whether it would have or not, fruitfully addressed. So they can provide a factual and legal discussion, even if they can't rule an act of Congress unconstitutional. That's right, Your Honor, and I think that the Supreme Court's subsequent decision after DBC and Elgin really makes that clear, that where there are statutes that the agency is expert in administering, and certainly I would say that the USPTO is the expert in how the director exercises or could exercise authority in the USPTO, are all matters that the agency could have addressed. So you see no futility in raising that issue? No, Your Honor, none. I also want to note that the Arthrex panel described what the appellant there was seeking was a constitutionally appointed board. I don't want to re-argue Arthrex here, but I think what a patent owner wants is the inverse in a lot of ways. It's not that they want a constitutionally appointed board, they just don't want their patent invalidated by an unconstitutional board. And if that's what they want, the agency, let's just suppose that the agency, when faced with an appointments clause challenge, thought to itself, goodness, we've got a problem here, we want to shut it down. It could have simply declined to institute IPRs. This is not a situation where the agency is obliged to exercise its authority if it thought, contrary to its actual belief, because we maintain that this is all constitutional, there was some sort of related appointments clause defect in the way that it was established, vis-a-vis these particular litigants. Okay, I think you're right. That was addressed in Arthrex. It was addressed in Arthrex. Just a note on the remand question. We would urge the court to not issue hasty remands. We may file a rehearing petition. The Appellee, Smith & Nephew, and Arthrex may file a rehearing petition for precisely some of the reasons that Judge Hughes touched on, the sort of inefficiency for all involved of having to file multiple rehearing petitions in multiple cases that are remanded. I also want to note, I'm aware of one remand having already occurred on Thursday. I believe it's a Unilock case, 18-2251, where the government was not given a chance to intervene per federal rule of appellate procedure 44. So we are actually not a party to that case that can fight remands. And, of course, that we find a very troubling situation, where we were not permitted to use our statutory right under 2403 to become a party where an act of Congress is being challenged and potentially invalidated in a way that results in a remand to us. We recognize the need and the value of having the government's participation on this issue and also our own rule that requires that as well. I know I'm out of time, but if I could just mention one more issue. The remand in Arthrex, as we've discussed, of course, does not go into effect until after the chance or the disposition of any rehearing petitions. I just want to note, we consider the effect of the opinion, just as it's finding precedent on this Court, just as this panel could not today issue a decision inconsistent with Arthrex, we think the effect of the Arthrex panel's constitutional ruling to go into effect immediately. So we do not understand the APJs to currently have any removal restrictions out of respect for the Arthrex panel's decision. We think those removal restrictions were invalidated as of last Thursday afternoon. The Court has no further questions. That was an interesting comment. I'm not quite sure what we're asking the Court to do. I mean, ultimately, we'd like you to affirm, but we understand that at the moment, with Arthrex in place, I guess I suppose what we're asking you to do is to hold off on disposing of this case until the fate of Arthrex is decided. Okay. We thank you for your argument. Mr. Favre, you have five minutes. Thank you, Your Honor. I'd like to begin by answering two questions. Keep it as fascinating as it's been so far. It's an interesting issue. I'd like to begin by answering two questions Judge Hughes posed. One is, in Lucia, was there any subsequent review capability? The answer is yes. The quote is, the Commission can then review the ALJ's decision either upon request or sua sponte. That's 138 Supreme Court at 2049. The second question that Your Honor raised was, isn't it more efficient to do this once as opposed to having a lot of different things doing it? We would be on the same schedule roughly as Arthrex if you issued a decision relatively promptly following Arthrex. And therefore, the en banc timing would be relatively similar, off by maybe a week or so. And my earlier point I think was just buttressed by the government's argument that this case, the set of cases, is a much better vehicle for the court to consider en banc than Arthrex for two reasons now. One is, there's no party in Arthrex to help the court understand the other side of the question of whether the Arthrex remedy is effective. Because all parties there agreed it was. And that's a huge issue. But the second point, which Your Honor's discussed with the government at some length, is that in Arthrex, there was a waiver question which affected arguably, at least according to the government, both the question of whether the case should be heard at all and the remedy. That's not true of the 1831 case, Polaris case. That is not true at all. So, again, the 1831 case for sure is distinguishable on both of those grounds and the 7068 case is distinguishable on the first more important ground. But that's why those cases are more appropriate vehicles for both en banc review because you have someone able to make arguments and help the court address an issue that is going to be of paramount importance and it takes away an argument that might detract from those. And so I think for those two reasons, the appropriate path is to issue a decision in this case following Arthrex. We would then file a petition for en banc review on the issues that I've discussed and presumably the government and Kingston would file an en banc review on the issues they disagree with. What makes a difference between issuing now and waiting until Arthrex mandates and then issuing the decision right after it mandates? I think there's no negative reason to do that and the positive reason not to do that is that you're wasting 45 days in having the cases off cycle. It's much better to have the petitions en banc arrive at the same time so that the court can consider them at the same time. If we're offset by 45 days or so, then I think it's more difficult for the court to coordinate that and decide what it wants to take up and how. And there's no positive reason to do that because for the same reason that Arthrex doesn't go into effect until the mandate, the remand doesn't happen, et cetera, neither does ours. And if the mandate doesn't happen because there's an en banc petition that's been granted in one case or the other, the mandate still hasn't issued. Well, the negative effect is that not – I mean, you're clearly willing because you have other arguments to brief rehearing now. The negative effect is that if we do this in every single case where a – as the government calls it a hasty remand, everybody's going to have to do this and there's going to be a lot of cases. And even if some private parties on the other side decide not to seek rehearing, although I suspect most of them will, the government will have to until it makes its final decision. I mean, it seems to me like a – I'm not sure how many of those cases there are. There's Uniloc and there's us. Your Honors will know better than I how big a problem that is, but I'm not sure in terms of cases that are fully briefed and ready to go. I don't think there's that many. So we're really talking about what's going to happen in the next 35, 40 days. Okay. And yours is – these two are the only ones you're aware of except Uniloc, which the government I think appropriately objects remanded without their knowledge or ability to participate. And that's something the government can intervene to request something to happen in Uniloc, but that doesn't affect this case where the government has had all of its rights and appeared repeatedly and stated its views quite clearly. I do want to address quickly a couple of points. Casper Kingston talks about this being a mosaic and you don't need full, plenary, absolute de novo review. And I think there's some force to that. There are cases that talk about meaningful review and why a particular level of review is meaningful. So I don't think the cases absolutely require in all instances de novo review. But in the cases where it wasn't de novo review, they also required full termination at will. Sure, but they have that now. That's something that we can fix. But there is no case that I'm aware of where full termination at will by itself was sufficient without some meaningful form of review. And counsel argues there's review in the sense of precedential decisions and things like that. Those were addressed at length in the decision. And I think that Arthrex disposed of that at the slip opinion in pages 9, 10, 11, 12, and 13 very effectively. I thought they analyzed that. What about the director's ability to intervene at this court independently from the PTAP decision and confess error? That's not a review within the presidential branch. So the issue under Edmonds is, is that person, the APJ, speaking for the executive branch or not? And if there's not a level of review that's meaningful and substantive of that decision, then the answer is they are. And I'm aware of no Supreme Court case at all which holds that without some meaningful, substantive review of individual decisions, that you at that point can call them an inferiority. What about where the director exerts its discretion and elects you sit as a panelist on one of the reviews? Is there a meaningful review there? In that instance, that director is only one of three. And the review is being done by the board. That decision has no review. But that review is not by a board that is people like the director. It's two people who are unconstitutional. So the answer is there is no review by a constitutionally appropriate board before it comes to this court. The only other point I wanted to make, if I may, is the case that's cited by Kingston to support holding this case in abeyance, the Carnegie Mellon case, was really a quite different situation. You're outside the scope of their argument. Okay. I was trying to address his abeyance point. Okay. Thank you. All right. Thank you. We thank the party for their arguments. And every administrative law and civ pro prof in the United States thanks you, too.